Filed 1/31/19

CERTIFIED FOR PARTIAL PUBLICATION[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| THE PEOPLE, | C079134 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F05572) |
| v. | |
| TYRUS HULL, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Emily E. Vasquez, Judge.  Affirmed.

Anne V. Moore, Retained Counsel for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II. and III. of the Discussion.

In this case, we address whether the prosecution must grant use immunity to a prosecution witness who invokes his right of self-incrimination at trial instead of introducing the witness's preliminary hearing testimony under the provisions of Evidence Code section 1291,[1] the hearsay and confrontation clause exception for former testimony. We also address issues related to defendant's opportunity to cross-examine the witness during the preliminary hearing.

Defendant Tyrus Hull appeals from a judgment of conviction for the assault of Marqurus Bonner. A jury found defendant guilty of assault with a deadly weapon, to wit, a motor vehicle. (Pen. Code, § 245, subd. (a)(1).) The trial court sentenced defendant to two years in state prison.

On appeal, defendant contends that: (1) the trial court erred in admitting at trial prosecution witness Jerry Chatman's preliminary hearing testimony after he invoked the right to remain silent because the defense did not have the opportunity to cross-examine Chatman about a prior criminal conviction not disclosed by the prosecution until after the preliminary hearing or about alleged threats made to defendant's wife the day after defendant's arrest; (2) instead of allowing the prior testimony, either the trial court or the prosecutor should have provided Chatman use immunity and the prosecutor failed to adequately explain his reason for declining to provide immunity; (3) the manner of reading the preliminary hearing testimony was inappropriate and imputed the demeanor of the reader to Chatman; and (4) counsel at his preliminary hearing was constitutionally ineffective for failure to cross-examine Chatman regarding his alleged participation in threatening and intimidating defendant's wife the day after the alleged assault occurred.

In the published portion of this opinion, we conclude that the trial court was not required to grant immunity. Additionally, the prosecutor here was not required to

---

[1] All further statutory references are to the Evidence Code.

2

provide immunity because the defense did not establish that what it hoped to gain by cross-examination was clearly exculpatory and essential. Regarding defendant's contention that the prosecutor did not adequately explain in the trial court his refusal to grant immunity, we conclude the prosecution was under no obligation to set forth governmental interests countervailing against a grant of immunity because the defense failed to show that the testimony it hoped to gain was clearly exculpatory and essential and for the additional reason that defendant did not clearly assert that the prosecutor's refusal to grant immunity was prosecutorial misconduct. Regarding the opportunity to cross-examine requirement of section 1291 related to post-preliminary hearing disclosure of the witness's criminal history, we note that whatever the prosecutor's statutory and constitutional discovery obligations may have been, the failure to disclose the witness's criminal history before the preliminary hearing deprived defendant of the opportunity to cross-examine the witness about it at the preliminary hearing. However, in this case, any error was harmless beyond a reasonable doubt. Regarding a post-arrest incident where defendant's wife was threatened by victims in this case, we make clear that the defense cannot forgo cross-examining a witness at a preliminary hearing about information then known to defendant or the defense team and later prevent the introduction of the preliminary hearing testimony at trial under section 1291 on the grounds that the defendant did not have the same motive or opportunity for cross-examination at the preliminary hearing.

In the unpublished portion of this opinion, we further conclude that there was nothing inappropriate about the reading of the preliminary hearing testimony and that defendant has failed to establish ineffective assistance of counsel.

We affirm.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

Defendant was charged with three counts of assault with a deadly weapon, to wit, a motor vehicle, in violation of Penal Code section 245, subdivision (a)(1). The alleged victims were Jerry Chatman (count one), Marqurus Bonner (count two), and Brandon Jackson (count three).

### Prosecution's Case-in-chief

The charges in this case stem from an August 25, 2013, verbal altercation between defendant and three younger men who were strangers to defendant—Bonner, Jackson, and Chatman. The events took place at a medical marijuana dispensary in Sacramento.

Security guard Orlando Ramon testified that he heard an argument develop inside the dispensary between the three younger men and defendant. The three men loudly bragged about "pimping" women, to which defendant responded that they were young and did not know what they were talking about. The three men responded, " 'You don't know us. We do know what we are talking about.' " At some point, defendant said he was from Richmond and one of the three men said he was from Richmond as well. The three men purchased their medication and walked out, followed shortly thereafter by defendant. On his way out, defendant told Ramon, " 'These youngsters don't know what they're talking about.' " Defendant did not seem angry at the time. Ramon also exited, hoping his presence would prevent anything from happening.

Ramon testified that once outside, he saw the three men standing next to a Cadillac a "pretty good distance" away from defendant's vehicle. The three younger men were saying things to defendant as defendant walked toward his vehicle. Defendant got into his vehicle, drove off in the opposite direction as if he was about to leave, but then made a U-turn, drove back toward the three men, rolled down his windows, and stopped

4

right next to them.[2]  The younger men then walked into the street and continued to say things to defendant while approaching him with hand gestures.  Ramon thought the three men appeared to be aggressive, but they were not blocking defendant's path.  Ramon could not hear everything, but words were exchanged and he did hear some of what was said.

Ramon heard Bonner tell defendant to get out of his vehicle.  Defendant replied, " 'I'm not stupid.  There's three of you.' "  Bonner replied, " 'Don't worry about them.  It's just me and you.' "  Defendant then drove forward, made another U-turn and then drove back toward Bonner.  Ramon saw defendant accelerate rapidly toward Bonner and heard tires squealing.  Bonner ran toward an adjacent parking lot, at which point Ramon's view was blocked by trees.  Defendant exited the street and drove into the parking lot after Bonner.  Ramon thought he heard a "thump" as the tires ran over something and heard the other two men yell, " 'He hit him.' "  Their voices sounded "distraught," "high pitch[ed]," and "worried."  Defendant drove past Chatman and Jackson and the two then picked up rocks and threw them at defendant, missing his vehicle.

Ramon testified that defendant drove back onto the street and then re-entered the parking lot.  Defendant drove his vehicle into a tree planter area near where the men were located.  As defendant's vehicle approached, the men ran from where they had been standing near their car.  Two of the men threw rocks at defendant's vehicle.  Defendant then crashed into their Cadillac, keeping his foot on the gas and pushing the vehicle out onto the street.  At that point, the same two men threw more rocks at defendant's vehicle, this time breaking his windows.  As they continued to throw rocks, defendant drove

---

[2]  Ramon explained that defendant's vehicle had been parked on Otto Circle facing the opposite direction from the three men.  To exit Otto Circle, one could drive around the circle in the direction defendant's vehicle had been facing or make a U-Turn and drive in the opposite direction, the latter of which is a more direct way out of Otto Circle.

away. Ramon went inside to call 911 and when he came back outside, the three men were gone. They later came back to the scene sometime after the police arrived.

Bennett Hicks, an employee of the dispensary, testified that he could not remember any details of the incident because he has "Arnold-Chiari malformation," a condition that causes memory loss. He testified he remembered talking to police about what he saw on the video surveillance and that he remembered serving defendant while he was in the dispensary on that date. Hicks testified that he would not have lied to the police when he was interviewed that day. The trial court found that Hicks was not suffering from memory loss; rather he was being purposefully and deliberately evasive and untruthful in his testimony. Based on this finding, the court allowed Hicks' prior statements to the police and preliminary hearing testimony to be introduced.[3]

Sacramento Police Officer Jason Lee interviewed Hicks on the date of the incident. Officer Lee testified that Hicks identified defendant as the person driving erratically that day and identified Bonner, Jackson, and Chatman as victims of defendant's driving conduct. Hicks told Officer Lee that he did not see any of the three men get hit but did see "one of them flying out of the way." Hicks did not clarify exactly when in the chain of events he saw rocks thrown at defendant's vehicle, leaving Officer Lee uncertain as to whether it was before defendant possibly hit one of the three men. Hicks saw defendant drive on the grass and hit a palm tree, back away from the tree, and run into the parked Cadillac belonging to the three men.

In his preliminary hearing testimony, Hicks said he saw the three young men walk out of the dispensary after exchanging words with defendant, and defendant walked out shortly thereafter. Hicks then viewed the surveillance video from inside the dispensary. On the surveillance video, he saw the three men standing around the Cadillac when

_____

[3] Defendant does not challenge this ruling on appeal.

6

defendant made a U-turn and exchanged more words with the group. At this point, Hicks went outside to get the men to leave the facility. Once outside, Hicks heard an engine rev and saw defendant come through the parking lot, around the back of the Cadillac up to the grass, hit a palm tree with his vehicle, and then slide off the palm tree and T-bone the Cadillac. Hicks testified that he saw the three men throwing rocks at defendant, but only after defendant began driving erratically. Like Ramon, Hicks testified that he did not see defendant actually hit Bonner. However, Hicks did see Bonner "jumping, like getting up off the ground, like moving out of the way." While Hicks did not know if Bonner was hit, he testified that Bonner was close to defendant's vehicle at that moment.

Officer Justin Donnell of the Sacramento Police Department testified that he made contact with Bonner, who had returned to the scene. Bonner was driving a Cadillac with damage on the passenger side consistent with a collision from another vehicle on that side of the car. Officer Donnell observed that Bonner had sustained injuries to his right wrist, elbow, and knee. He further testified that he saw broken glass where the Cadillac had been parked, along with tire marks in the street, parking lot, and the grassy area of the parking lot. Officer Donnell explained that there were two different sets of tire marks going in slightly different directions, indicating two separate passes. He also saw a small tree that had been run over by a vehicle and tire marks in the grass that led from the parking lot directly to where the Cadillac had been parked. There were fist-sized rocks in the street. Officer Donnell believed that the tire marks indicated the driver was traveling at a high-speed and turning, but he also agreed on cross-examination the tracks could indicate the vehicle lost traction.

Some of the incident took place off camera and could not be seen in the frame of the dispensary's surveillance video recording, but the recording does depict the following: three men walked from the front of the dispensary toward the Cadillac. Defendant then exited and walked over to his vehicle, looking in the direction of the three men. Defendant's vehicle was parked in a direction facing away from the three men.

7

Defendant got in, made a U-turn and drove toward them. The three men appear to have said something to defendant as he drove up adjacent to where the Cadillac was parked. Defendant then drove past a few feet, but then stopped as one of the men approached him from behind. Defendant began to drive away again, stopped again briefly, drove, stopped and then finally drove off out of the video frame. The three men appear to be saying something to defendant as defendant drove off. One of three men gestured at defendant's vehicle while walking in defendant's direction, also out of the frame. Another of the men also walked in the same direction, behind a palm tree, which is located in the upper left corner of the video frame. Thereafter, the one man who remained in the picture appeared to be startled by something out of the frame. He ducked behind the palm tree, and then took a couple of steps toward the Cadillac, where he picked something up from the ground in the planter area, where there was landscaping rock. Defendant's vehicle then came back into the frame, driving fast through the parking lot next to the dispensary parking lot, past the Cadillac and out onto the street. The person who had picked up something from the planter area made a throwing motion towards defendant's vehicle as he drove by. Defendant's vehicle then turned and drove in the street past the Cadillac in the same direction he had earlier driven, turned left, and again went out of the frame. As he drove by on the street, two of the men threw objects at defendant's vehicle from their position on the opposite side of the Cadillac. Approximately five seconds later, defendant came around the palm tree, back into the video frame, driving through the planter area between the palm tree and the Cadillac, near where the two men who had thrown rocks were situated. Both men ran to the opposite side of the tree, out of frame. Defendant's vehicle then appears to have collided into the tree. It then crashed into the Cadillac, pushing it out into the street. Defendant then drove off again, out of the video frame in the same direction he had traveled before. The three men got into the Cadillac and drove in the same direction.

8

After Chatman invoked his right against self-incrimination outside the presence of the jury, the trial court allowed the prosecution to read his preliminary hearing testimony to the jury. Chatman testified that on the day of the incident, he was visiting the marijuana dispensary with his cousin Marqurus Bonner and his friend Rashad Jackson. He testified that he was not sure if words were exchanged between anyone in his group and defendant because he walked out ahead of Bonner and Jackson and heard no exchange inside. Outside, he heard words exchanged between Bonner and defendant. While he could not hear everything that was said, he heard Bonner say something like, "the promotion is wrong, or, it's the wrong promotion, or something in that nature."

Chatman testified that after the exchange, "Then that's when . . . defendant, he pulls -- or he pulls off -- or I thought he was pulling off, and he pulls off, and he turns around, and he runs -- he hits a buddy -- my cousin. Marqurus, he hits him, and he -- or he pulls into the driveway -- or after he hit him, he pulled into, like, pulled up into, like, a driveway where the cannabis club. It wasn't the actual cannabis club, but kind of next to it, and -- yeah." When asked again if defendant hit Bonner with the vehicle, Chatman affirmed that he did.

Chatman stated that up to this point in the incident, Bonner had not threatened defendant in any way, nor had he thrown any rocks at defendant's vehicle. Chatman testified that after Bonner was hit, he and Jackson began throwing rocks. The defendant then drove within five feet of Chatman and within five to 10 feet of Jackson as the two men threw rocks at the vehicle. Defendant then drove his vehicle into the Cadillac. Chatman checked on Bonner and noticed Bonner had sustained scrapes to his forearm and his legs were bleeding.

The surveillance video was played at the preliminary hearing and narrated by Chatman on direct and cross-examination. Chatman testified that the video showed that no rocks were thrown at defendant's vehicle until *after* Bonner was hit. But he explained that Bonner was hit "off camera." He testified that after defendant initially drove out of

9

the frame, defendant turned around and the motor revved. Defendant then drove directly at Bonner. Off camera, Bonner made an effort to get out of the way by running from the vehicle, but defendant ran into Bonner, hitting him with the front passenger fender. Bonner did "like . . . a little cartwheel in the air" over the front of the vehicle after being struck. Bonner had been hit in the hip by the front right fender of defendant's vehicle.

Officer Paul Curtis of the Sacramento Police Department testified that on the day of the incident, he went to defendant's home to speak to him and take photos of his vehicle. Officer Curtis described the damage to defendant's vehicle: the windshield in the lower, right-hand corner was damaged; the passenger-side front bumper was damaged; the front passenger-side tire was shredded; windows were broken out in both rear passenger doors; and the rear driver-side door was damaged.

Neither Bonner nor Jackson testified.

**Defense Case**

Latosha Hull, defendant's wife, testified in his defense. The trial court admonished the jury that her testimony was admitted solely for purposes of evaluating Chatman's preliminary hearing testimony, and not for the truth of the matter asserted.[4]

Mrs. Hull and defendant had been together twenty-three years. She testified that the day after her husband's arrest, two men, a taller muscular man she identified as Bonner and a slimmer man she identified at trial as Chatman, along with a woman, came to their home. They did not show any identification or introduce themselves.

The woman told Mrs. Hull that it was her car that had been damaged in the incident at the dispensary and asked for insurance information. Bonner interceded and threatened Mrs. Hull. He demanded that his car "be fixed or else." He asked for money and then asked for insurance because Mrs. Hull did not have any money. He told

---

[4] Defendant does not challenge this ruling on appeal.

10

Mrs. Hull that he had just done six years in prison, that he did not "want to be in a courtroom pointing fingers at nobody" and he "handles his own." He told her that he saw her leave for work the previous night and that the house "would have been lit up." He named previous addresses where the Hulls had lived. Mrs. Hull was terrified. She understood Bonner's reference to lighting up their house to mean that he would have shot a firearm at the house.

Bonner did all of the talking during the encounter. According to Mrs. Hull, Chatman did not make any threats. She testified that when Bonner referenced having visited their house the night before, Chatman "kind of agreed with him like, yeah, we were here last night. And he didn't really say too much." "He was just standing there. Just confirming like we was out here."

Mrs. Hull testified that she originally thought the other man with Bonner was Jackson and so informed the public defender investigator. She testified that she thought the second person was Jackson based on information in the "arrest paperwork" defendant had received when he was released. She testified that after seeing the men at defendant's preliminary hearing on October 1, 2013, she realized the other man was Chatman. She also testified that on March 12, 2015, during the trial, she saw the slimmer man outside the courtroom and knew it was Chatman. She notified the trial prosecutor and defendant's trial counsel that the slimmer man was Chatman for the first time four days later.

Defendant testified in his defense. He told the jury that when he engaged the three men in conversation inside of the dispensary, he was introducing them to his line of clothing, MOR (Manage Over Ratchet) Righteous Gear, in an effort to sell the men some of his clothes. This led to Bonner saying that he doesn't "fuck with ratchets. No, I'm a pimp. I pimp hoes." Defendant responded that a pimp is a bad person, which angered Bonner, who told defendant, " 'Don't be talking like that. I'm from Richmond.' " Defendant replied, " ' If you're a rich man, then why you pimping?' " People present in

11

the dispensary laughed at this remark. Bonner yelled something, which defendant did not recall, in a loud, angry voice. Defendant told Bonner he should not be pimping women and thereafter Bonner left.

Defendant testified that when he left the building, the men came toward him, with Bonner stating, " 'You talk too much. . . . Why you disrespecting where I'm from?' " Defendant denied disrespecting Bonner and repeated, " 'If you're a rich man, why you be pimping?' " Defendant testified that after he got in his vehicle, the three men told him to get out and when he refused, they began to follow him. Defendant testified that he made a U-turn because he thought there was a dead end in the direction he was pointed. He had only been going to the dispensary six months and thought the only way out of the area was to make the U-turn. Defendant said the men were "in the middle of the street" flagging him to stop. He acknowledged that they were not blocking his way. He slowed down and stopped, even though he had passed the men. He acknowledged he could have kept going, but testified he did not because "we was having a conversation." Bonner told him to get out of the car. Defendant thought Bonner wanted to fight so he declined to get out. Defendant said he was going to leave until Bonner kept following him. Defendant drove up a little and stopped again, "because we're still talking." Defendant testified that he told Bonner, " 'Pimping is slavery, ratchet behavior.' " According to defendant, Bonner replied, " 'What you say? Come back.' " So as defendant explained, he turned his vehicle around. Defendant claimed his intent at that time was to park and talk. He was going back to tell Bonner what he had said.

Defendant testified that Bonner had a rock in his hand at the time, which he threw at defendant's windshield. The rock shattered the passenger side of the windshield and this frightened defendant. He testified that they were running toward him and he panicked, stepped on the gas to "get up out of there." Bonner was "in front of [defendant's] vehicle on the passenger side." Defendant testified that he "did not"

12

"intend to hit him." Defendant said he was trying to leave as his vehicle passed Bonner and he entered the parking lot.

Defendant testified that as he drove away, a rock was thrown and "bust the window out." Because he was ducking, laying over to the side to avoid being hit in the head, he did not realize he had made a U-turn again. He claimed he had no intention of hitting the other two people. He testified that the vehicle was out of control when he bounced off of the tree and ran into the Cadillac. His only intention was to leave. He testified that he went home after leaving the scene and only learned later that someone had been hit.

On cross-examination, defendant admitted that he told Officer Curtis on the day of the incident that he "bumped" Bonner. But he said he made this admission only because Officer Curtis notified him that one of the men had been struck by defendant's car. Defendant said he was emotional when he made the statements to Officer Curtis because he was upset about the damage to his own vehicle. Nevertheless, defendant claimed that he was honest with Officer Curtis when he spoke with him. He denied telling the officer that he smashed into their car because he was upset that they had thrown rocks at him. Later, defendant testified that he was incorrect when he told the officer, " 'So I just hit the car because they banged up my truck.' "

Defendant testified that he was not trying to hit any of the three men and was simply trying to leave the parking lot. Defendant acknowledged, however, that before he drove toward Bonner, there was nothing blocking him from going home by driving away.

**Prosecution Rebuttal Case**

A portion of an in-car video recording of defendant speaking with Officer Curtis was played for the jury. During the course of the interview, defendant admitted multiple times to bumping Bonner with his vehicle.

Defendant told Officer Curtis: "These guys coming towards me so I figured, right then and there they was gang bangers calling me cuz I'm 41 years old I don't gang

13

bang. . . . These was terrorist guys, I feel terrorized. So they coming towards my truck I hop in my car, I hop in my truck. . . . They was in the middle of the streets approached me talking about they wanted to fight . . . . [O]ne brother got a rock, he threw a rock at my windshield of my car. You could see it on the passenger side of my windshield. So he threw a rock so I bumped him! I didn't run him over." Later Officer Curtis asked whether the person throwing rocks was the person defendant had bumped and defendant replied, "First ya ya I bumped him with the truck. Than [*sic*] they was throwing rocks, I was about to back out they kept throwing rocks. . . . I didn't try to kill nobody. I'm a family man, man I got a message to tell the world. So I just hit the car cuz they banged up my truck. Banging! I was just trying to get out. And I feel like they was really wanna be gang bangers." Officer Curtis asked defendant what he meant by, "I bumped him." Defendant replied, "I mean I didn't run him over, I bumped him with the car. He was thr[owing] the rock at me know what I'm saying that's that, my window was down." Officer Curtis then asked, "Okay and you hit their car because you were upset that . . . ." Without letting the officer finish the question, defendant cut him off and said, "They were terrorizing me throwing rocks, they was throwing boulders rocks. Like a gunshot! Like David and [G]oliath. Gunshot slingshot throwing rocks, they was throwing big boulders. Those are lethal weapons right?"

Officer Curtis testified that at one point in his conversation with defendant, defendant said he did not "bump" anybody with his car, but earlier on in the conversation admitted several times to bumping someone with his vehicle. Officer Curtis stated that defendant was talking really fast and seemed agitated throughout the conversation.

**Stipulations**

The parties stipulated to several matters, including two stipulations about Chatman. Both stipulations were read to the jury.

Stipulation of fact No. 1: "Jerry Chatman, Jr. was present in the hallway outside of Department 32 during the morning of March 12th, 2015. At that time, he had

14

shoulder-length dreadlock hair also known as twistees. Jerry Chatman, Jr. is the alleged victim in Count One."

Stipulation of fact No. 2: "Jerry Chatman, Jr. was convicted of misdemeanor violation of Penal Code section 12025(b)(6), carrying a concealed, loaded firearm on October 13th, 2004."

**Verdict and Sentencing**

The jury deadlocked as to counts one and three regarding Chatman and Jackson. However, the jury found defendant guilty on count two, assault with a deadly weapon on Bonner.

The trial court sentenced defendant to a prison term consisting of the low term of two years. The court granted the prosecution's motion to dismiss counts one and three.

**DISCUSSION**

**I.  Refusal to Give Prosecution Witness Immunity and Admission of the Witness's Preliminary Hearing Testimony**

**A.  Background and Defendant's Contentions**

Prior to trial, defendant made an in limine motion to introduce evidence of the incident involving Mrs. Hull. During the in limine motion hearing, defense counsel informed the trial court that Mrs. Hull had identified Chatman four days earlier in the courthouse as one of the two men who had come to her home and threatened her. She identified him as the one with dreadlocks. Defense counsel stated he wanted to cross-examine Chatman about this incident for impeachment purposes. The prosecutor stated that he had not yet been provided with the report written by the public defender investigator but noted that Mrs. Hull had previously identified a different person, not Chatman, as the second man who had been present.

The following day, after the prosecutor had been provided the report written by the public defender, the parties resumed argument on this matter. The prosecutor informed

15

the court that it may need to appoint counsel to represent Chatman because of what Mrs. Hull had alleged, and the court appointed counsel.

During the argument on the admissibility of Mrs. Hull's testimony, defense counsel told the court that the event was "threatening" and "cause[d] alarm." He also told the court, "And just, per chance, that my client wasn't home. . . . I mean, he could have opened the door. It just so happened he wasn't home at the time although his children and wife were." He informed the trial court that the Hulls moved as a result the incident. Counsel said he wanted to cross-examine Chatman about the incident for impeachment purposes, arguing that the evidence was admissible to establish Chatman's bias or motivation to lie. The trial court ruled that the evidence concerning this incident was admissible because it was "very probative" of Chatman's credibility.

Thereafter, the court turned to the admissibility of Chatman's prior convictions. The defense had filed an in limine memorandum asserting that carrying a concealed firearm was a moral turpitude offense. Chatman had a prior misdemeanor conviction in 2004 for that offense. The trial court ruled that Chatman could be impeached with the 2004 misdemeanor conviction.[5] Chatman had two other misdemeanor convictions, one in 2007 and the other in 2013, but the trial court ruled that these convictions did not involve moral turpitude and thus could not be used for impeachment.[6]

_____

[5] Defendant also asserted that at the same time he received Chatman's rap sheet, the prosecution disclosed a police report purportedly about Chatman failing to register as a sex offender. Defense counsel later informed the trial court during oral argument that the report was from 2006. However, we have no reason to address the sex registration matter or any underlying sexual offense conviction given that the trial court found Chatman had only one impeachable prior conviction, there was no further on-the-record discussion about the police report in the trial court and defendant does not address this matter on appeal.

[6] While defendant filed an in limine memorandum arguing that carrying a concealed weapon is a crime of moral turpitude, nothing was mentioned about Chatman's other two

On the following day, outside the presence of the jury, Chatman, represented by counsel, refused to answer a question regarding his former hairstyle which he had at the dispensary as depicted in the surveillance video. As noted, Mrs. Hull had said the second man present with Bonner had dreadlocks. Thereafter, additional questions were posed, all of which Chatman refused to answer, and the court ruled he had properly invoked his right against self-incrimination.

Apparently having anticipated that Chatman might invoke his right against self-incrimination, the prosecution filed a written motion to introduce Chatman's preliminary hearing testimony under section 1291. Defendant filed written opposition, arguing that section 1291 required that the defense have had a meaningful opportunity to cross-examine the witness at the preliminary hearing. The preliminary hearing was held on October 1, 2013. Defendant asserted that the prosecutor did not disclose Chatman's rap sheet until October 31, 2013. Hence, counsel at the preliminary hearing did not have a meaningful opportunity to cross-examine Chatman and explore his credibility with regard to his past misconduct." Defendant's written opposition focused only on the late disclosure of Chatman's criminal history and made no reference to a lack of opportunity to cross-examine Chatman about the incident involving Mrs. Hull.

Defendant also argued that under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), the confrontation clause allows testimonial hearsay only if the defendant had a previous opportunity to cross-examine and the witness is unavailable. Defendant asserted that the prosecutor's choice not to give Chatman immunity is the reason why Chatman is unavailable. Defendant further argued that to the extent that the prosecutor's choice was "premised on good faith, good faith must exclude 'tactical advantage' in litigation (e.g., to shield the witness from cross-examination on

_____

convictions. The nature of those convictions is not revealed in the record and defendant asserts no error related to the trial court precluding impeachment with those convictions.

17

topics not explored or known at the time of the preliminary hearing).” Defendant cited no case law supporting his immunity argument and did not expressly assert prosecutorial misconduct.

During oral argument on the prosecution’s motion, the prosecutor argued that section 1291 permits introduction of Chatman’s preliminary hearing testimony and providing immunity to a witness is not required. Focusing on the matter of Chatman’s criminal history, the trial prosecutor acknowledged that a prosecutor’s *Brady*[7] obligations extend to preliminary hearings, but the prosecutor argued *Brady* had not been violated because the outcome of the preliminary hearing would not have been different had the defense been made aware of Chatman’s prior conviction.

As defense counsel was acknowledging that the prosecutor had provided the rap sheet consistent with his statutory discovery obligations, the trial court shifted the focus from the rap sheet to the incident involving Mrs. Hull, asking defense counsel whether he had the report of that incident at a time earlier than when the prosecution had provided discovery of Chatman’s prior convictions. Defense counsel replied, “Yeah, my office did.” The court then asked when defense counsel became aware of the incident. Counsel replied, “We have had discovery of that. When we realized it was Mr. Chatman was last Thursday.” The trial court again asked counsel when had become aware Mrs. Hull’s statement and counsel replied, “I had that statement quite a long time ago.” The prosecutor informed the court that statement from the public defender was dated October 9, 2013. Defense counsel represented, “So we got that information after the preliminary hearing.[8] And we discovered, let’s just say, within the last week that there

---

**7** *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*).

**8** Defendant was represented by a different public defender at the preliminary hearing. As we discuss *post*, Mrs. Hull testified at trial that she had talked to defendant’s previous attorney about the incident at the preliminary hearing on October 1, 2013, and had at that

was an identification issue, that it was actually Mr. Chatman who Mrs. Hull had contact with."

Defense counsel then turned his argument back to the late disclosure of Chatman's criminal history, arguing that defendant had no opportunity to cross-examine Chatman about that at during his preliminary hearing testimony. He also argued that the jury would not see Chatman's demeanor when confronted with impeachment evidence. He maintained that the demeanor of witnesses would change and that they would lie when confronted with impeachment evidence. He acknowledged, "I don't know how Mr. Chatman would have lied, dissembled, or responded when confronted with that," but then argued, "In a sense, what [the prosecutor] wants us to do is substitute the mere fact of his conviction for the response that he would have given to us." Thus, according to defense counsel, the written stipulation about Chatman's prior conviction would not be a sufficient substitute for his live testimony.

Regarding immunity, defense counsel argued, "[I]t strikes me that the DA has a choice. Either he can do this for a tactical advantage which, you know, he's a litigator, he can do that, although I don't know if he would consider that good faith, or just say it isn't a tactical advantage. Just say it's a weighing of interests." He further argued that the weight of the prosecutor's decision not to grant immunity "goes entirely against my client's trial rights." Defendant would not be able to confront and cross-examine Chatman in front of the jury so the jury could assess his credibility. Defense counsel never asserted that the prosecutor's refusal to grant immunity was prosecutorial misconduct or cited any case authority on the subject.

The trial court initially denied the prosecutor's motion to admit Chatman's preliminary hearing testimony, reasoning that defense counsel did not have the same

time informed counsel that Chatman, who was present in the courthouse, was the second male. The public defender investigator later testified at trial that he spoke with Mrs. Hull on October 29, 2013, and at that time, she said Jackson was the second person.

19

motive and opportunity to cross-examine Chatman at the preliminary hearing as he would have had if he had known of the impeachment evidence. The court stated that if the prosecution chose to grant immunity, Chatman would testify and the defense could cross-examine.

The prosecutor objected and asked for a one-day continuance to investigate filing a writ. The trial court granted a recess. During the recess, the trial court conducted research on its own and as a result, reversed its ruling.

The court stated it had been confused about when the defense became aware of the incident involving Mrs. Hull, and said that defense counsel, with the prosecutor present, informed the court that counsel's office was made aware of the incident on October 29, 2013. The court ruled: "I find that the defense had access to Mrs. Hull. I find that the defense could have examined Mr. Chatman about this incident if they had done their investigation sooner." Thus, according to the trial court, "the defense had the right and the opportunity to cross-examine Mr. Chatman with an interest and motive similar to that which he has at this . . . trial." The trial court did not return to the issue of the late disclosure of Chatman's prior conviction. The court ruled that Chatman's preliminary hearing testimony would be admissible under section 1291.

At the conclusion of the trial, the court instructed the jury with CALCRIM No. 317: "The testimony that Jerry Chatman, Jr. has given under oath was read to you because he is not available. You must evaluate this testimony by the same standards that you apply to a witness who testified here in court."

On appeal, defendant argues that he was denied the opportunity to cross-examine Chatman at the preliminary hearing about his prior conviction and his participation in the incident involving Mrs. Hull and thus his preliminary hearing testimony should not have been admitted. Defendant also argues that the trial court was required to either order the prosecution to grant statutory immunity to Chatman or to grant judicial immunity by its

20

own accord, in order to protect defendant's constitutional rights to confrontation and a fair trial. As we shall explain, we disagree.

## B. Analysis

### 1. Section 1291 and the Confrontation Clause Right

Section 1291, subdivision (a)(2), allows introduction of prior testimony when "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and *had the right and opportunity to cross-examine* the declarant with *an interest and motive similar to that which he has at the hearing.*" (Italics added.) The "motives need not be identical, only 'similar.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 975.)

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' " (*United States v. Owens* (1988) 484 U.S. 554, 557 [98 L.Ed.2d 951, 956] (*Owens*).) However, a defendant's constitutional right to confront witnesses is not absolute. (*People v. Valencia* (2008) 43 Cal.4th 268, 291 (*Valencia*).) Testimonial statements of a person who does not testify at trial are admissible against a criminal defendant over a confrontation clause objection when (1) the declarant is unavailable, and (2) the defendant had a prior opportunity to cross-examine. (*Crawford, supra*, 541 U.S. at p. 59; *Valencia*, at p. 291 [holding that prior preliminary hearing testimony is admissible when these conditions are met].)

"Evidence Code section 1291 codifies this traditional exception" to the confrontation clause right. (*People v. Wilson* (2005) 36 Cal.4th 309, 340 (*Wilson*).) "When the requirements of . . . section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution.' " (*Wilson*, at p. 340.) "The constitutional and statutory requirements are 'in harmony.' " (*People v. Smith* (2003) 30 Cal.4th 581, 609.)

21

## 2. Unavailability and Immunity

A witness is unavailable for purposes of section 1291 and a confrontation clause claim if he is entitled to invoke the privilege against self-incrimination and does, in fact, invoke that privilege. (*People v. Williams* (2008) 43 Cal.4th 584, 613, 618, 625.) Here, the trial court properly found that Chatman was entitled to invoke his Fifth Amendment privilege against self-incrimination and refuse to testify.[9]

Defendant argues that Chatman could have been available to testify notwithstanding his invocation of his right against self-incrimination. He contends that the trial court was required to either order the prosecution to grant statutory immunity to Chatman or to grant judicial immunity by its own accord, in order to protect his constitutional rights to confrontation and a fair trial. Defendant argues that immunity was necessary because Chatman's testimony was critical to the prosecution and not impeached at the preliminary hearing. Granting immunity to Chatman, according to defendant would mean he was no longer unavailable, his preliminary hearing testimony would not have been admissible as prior testimony under section 1291 and Chatman would have been subject to cross-examination at trial.

Defendant argues that on the issue of forcing a grant of immunity, the controlling case is *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964 (*Smith*). The People, in turn, argue that *Smith* has been partially abrogated by *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243 (*Quinn*), which held that *Smith*'s rule allowing judicial immunity impermissibly interfered with the executive branch's prosecutorial discretion. (*Quinn*, at pp. 251-257.) The People instead argue that the controlling case in California

---

[9] Defendant acknowledged in his written opposition in the trial court to the prosecution's section 1291 motion that Chatman was exposed to criminal liability for: "(1) a violation of Sacramento probation (2) a possible assault and vandalism charge arising from the incident involving [defendant], and (3) charges arising from a visit to [defendant]'s residence the day following the incident charged in this case."

is the more recent *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*). As we shall explain, we agree with the People.

*Smith*, *Quinn*, and *Masters* all arise in the context of the defense seeking immunity for a defense witness who invokes the right against self-incrimination. While our case involves a claim that a "critical" prosecution witness should have been given immunity to avoid the introduction of prior testimony under section 1291, we conclude the analysis discussed in *Quinn* and *Masters* applies here. We first address defendant's claim that the trial court should have granted judicial immunity.

### a. Judicial Immunity

In *Quinn*, the United States Court of Appeals, Third Circuit (Third Circuit), noted that every other circuit had rejected its earlier holding in *Smith* that federal district courts could grant judicial immunity. In turn, the *Quinn* court did the same. (*Quinn, supra*, 728 F.3d at pp. 247, 251.) In *Masters*, following the *Quinn* court's lead, our high court held that "California courts have no authority to confer [judicial] use immunity on witnesses." (*Masters, supra*, 62 Cal.4th at p. 1051.) " '[T]he power to confer immunity is granted by statute to the executive.' " (*Id.* at pp. 1051-1052.) We are bound by our high court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, the trial court was not required to grant Chatman judicial immunity.

### b. Prosecutorial Immunity

While judicial immunity has been foreclosed, our high court in *Masters* recognized that prosecutorial immunity could be compelled as a requirement of due process if the prosecutor's refusal to grant immunity amounts to prosecutorial misconduct.[10] (*Masters, supra*, 62 Cal.4th at pp. 1051-1052.) The *Masters* court noted

---

[10] As in *Masters*, defendant in the instant case did not expressly object on grounds of prosecutorial misconduct and we will "read [defendant]'s claim to include the contention that the prosecutor committed misconduct by not granting immunity." (*Masters, supra*,

the Third Circuit in *Smith* reasoned that "due process may compel a defense witness to be immunized:  If a defendant can show that the prosecutor refused to grant immunity ' "with the deliberate intention of distorting the judicial factfinding process," ' a retrial is necessary.  [Citation.]  When the prosecutor is found have committed misconduct by withholding immunity, the remedy is to set aside the conviction and permit a new trial, at which the prosecutor can be ordered 'to grant statutory use immunity,' so that the witness can testify, or else face 'a judgment of acquittal.' " (*Masters*, at p. 1051, citing *Smith, supra*, 615 F.2d at p. 969.)

The *Masters* court then noted the test for prosecutorial misconduct in California is well-settled.  " 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*Masters, supra*, 62 Cal.4th at p. 1052.)

But the *Masters* court went on to note the Third Circuit continues to use the five factors discussed in the *Smith* test to evaluate claims of prosecutorial misconduct based on the refusal to grant immunity to a witness.  Those factors are:  " ' "[1] [witness immunity was] properly sought in the [trial] court; [2] the . . . witness [is] available to testify; [3] the proffered testimony [is] *clearly exculpatory*; [4] the testimony [is] *essential*; and [5] there [are] no strong governmental interests which countervail against a grant of immunity." ' " (*Masters, supra*, 62 Cal.4th at pp. 1051-1052, italics added,

_____

63 Cal.4th at p. 1052.)  In so doing, we do not excuse from forfeiture the requirement that counsel make the appropriate objection in the future.  Indeed, as we note *post*, the prosecution is under no obligation to assert governmental interests countervailing against a grant of immunity unless the defense asserts that the prosecutor's refusal to grant immunity amounts to prosecutorial misconduct.

quoting *Quinn, supra*, 728 F.3d at p. 251, & *Smith, supra*, 615 F.2d at p. 972.) In *Masters*, the court reasoned that the defendant failed to satisfy the *Smith/Quinn* test. (*Masters*, at p. 1052.) We reach the same conclusion here.

Setting aside the other *Smith/Quinn* factors, Chatman's testimony was not clearly exculpatory, nor was it essential. In this context, clearly exculpatory means that the witness's testimony "would exonerate or free [the defendant] of guilt or blame." (*Quinn, supra*, 728 F.3d at p. 262.) "Testimony that is 'at best speculative,' [citation] 'severely impeached' by the witness's prior inconsistent statement(s), [citation] ambiguous on its face, [citation], or 'even if believed, would not in itself exonerate [the defendant],' [citation], is not clearly exculpatory." (*Ibid.*) Testimony is not clearly exculpatory when it relates only to the credibility of the government's witnesses. (*Smith, supra*, 615 F.2d at p. 972 [under the former test for granting judicial immunity, immunity would not be granted where the proffered testimony related only to credibility of a prosecution witness].)

*Smith* is illustrative on the application of the " 'clearly exculpatory' " and "essential" requirements. There, the defense sought to call a witness who previously made a statement to police inculpating himself and three other non-defendants as the perpetrators of the charged crimes. (*Smith, supra*, 615 F.2d at pp. 970, 972.) Prior to trial, the witness invoked his Fifth Amendment right against self-incrimination. In response to a defense request for immunity for the witness, juvenile authorities consented if the United States Attorney agreed. The United States Attorney refused to grant immunity for unstated reasons. (*Smith*, at p. 974.) The *Smith* court held that the prosecutor should have granted immunity because the prosecution's case was weak in relying on a lone witness's testimony, the defense witness's testimony would have been severely damaging to the prosecution, and there was no government justification for refusing to consent to the immunity offered by the juvenile authorities. (*Ibid.*)

25

Defendant contends that the instant case is similar to *Smith*. We disagree. Aside from the obvious fact that the defense did not call Chatman as a witness, Chatman's testimony was not clearly exculpatory. Quite the opposite, it was significantly inculpatory.

Defendant argues Chatman should have testified at trial for the purpose of allowing the jury to observe his demeanor when questioned about his prior conviction and his role in the incident involving Mrs. Hull. However, what Chatman's demeanor would have been and whether it would have been helpful to the defense is purely speculative. Indeed, even trial counsel acknowledged, "I don't know how Mr. Chatman would have lied, dissembled, *or responded*." (Italics added.) What his answers might have been regarding the incident involving Mrs. Hull is also speculative. Indeed, assuming Chatman was the second male present, even according to Mrs. Hull, he mostly only stood by during that incident. Her testimony about him agreeing they had been at the home the evening before was vague. If asked about the incident at trial, Chatman may have admitted what took place and blamed Bonner for any untoward aspect of the attempt to be paid for damages or collect insurance information. On the other hand, he may have convincingly denied his presence or Mrs. Hull's version of the events. Either way, defendant cannot establish that his testimony was clearly exculpatory because any benefit to be derived from him testifying at trial was purely speculative and went only to the issue of his credibility. (See *Quinn, supra*, 728 F.3d at p. 262; *Smith, supra*, 615 F.2d at p. 972.)

Additionally, because Chatman's demeanor and answers are speculative, it cannot be said that his testimony is essential. Furthermore, the jury heard about Chatman's single impeachable prior conviction and was properly instructed it could consider that conviction in deciding his credibility. Further, the jury heard from Mrs. Hull about her version of the incident at the family home, and the jury was likewise instructed it could

26

consider any misconduct by Chatman in deciding his credibility. Thus, for these additional reasons, Chatman's testimony was not essential.

We also note that the evidence in this case is far stronger than the evidence in *Smith* and thus, we disagree with defendant's comparison of the instant case to the weak case in *Smith*. As noted, the prosecution's case in *Smith* rested solely on the testimony of one prosecution witness. Defendant makes much of the fact that Chatman was the only victim who testified here. We see this as inconsequential. First, since the jury was unable to agree on whether he was a victim, we see Chatman more as an eyewitness to the assault on Bonner. Second, in many types of assaultive cases, the victim never testifies (e.g., homicide, domestic violence). The absence of victim testimony is simply not concerning and is in no way analogous to *Smith* where the case depended solely on the testimony of a single witness. Indeed, the other evidence the jury heard, which defendant would apparently have us disregard, was compelling. As the Third Circuit and our high court have noted, even when the testimony of a witness the defense seeks to immunize would contradict the prosecution's evidence, that testimony is not viewed as "clearly exculpatory" when it is "*overwhelmingly* undercut or undermined by substantial prosecution evidence." (*Quinn, supra*, 728 F.3d at p. 263 [concluding that any testimony offered by the witness for whom the defense sought immunity would be overwhelmed by the prosecution evidence]; *Masters, supra*, 62 Cal.4th at p. 1053.) Here, not only did defendant fail to demonstrate how Chatman's live testimony would contradict the prosecution's case, but any benefit to be derived from his live testimony by defendant is overwhelmingly undercut and undermined by the other prosecution evidence.

Ramon testified that he witnessed defendant twice make U-turns, the first U-turn made apparently to leave the area and the second to turn around and drive toward Bonner; Ramon heard defendant's vehicle rapidly accelerate and the tires squealed as he drove from the street into the parking lot toward the fleeing Bonner; and Roman heard a thump followed by Chatman and Jackson both excitedly exclaiming " '[h]e hit him.' "

27

These spontaneous declarations are direct evidence of the assault. Rocks were not thrown at defendant's vehicle until this point, as defendant was exiting the parking lot for the first time. Moreover, Hicks told Officer Lee that he thought one of the three men got hit because he saw one of the them "flying out of the way." Additionally, Officer Donnell observed scrapes and cuts on Bonner's right arm and wrist and discoloration on his right elbow and knee. In his statement to the police, defendant said multiple times that he bumped one of the three men with his vehicle. Although the location where Bonner was struck was outside the surveillance video frame, defendant's movements, driving conduct, collision into the Cadillac captured on video all corroborate the witness accounts. Moreover, the video corroborates that no rocks were thrown at defendant's vehicle until after something startling took place out of the picture frame. Thus, the other evidence, apart from Chatman's testimony, overwhelmingly established defendant's guilt. This is particularly true given that assault with a deadly weapon does not require proof that defendant actually hit the victim with his vehicle. (*People v. Perez* (2016) 3 Cal.App.5th 812, 824-825 (*Perez*), disapproved on other grounds in *People v. Frierson* (2017) 4 Cal.5th 225, 240, fn. 8.) The proof of defendant's guilt here in no way compares to the case presented by the prosecution in *Smith*.

Defendant contends for the first time on appeal that the prosecution refused immunity to distort the factfinding process at trial and his due process rights were thereby violated. He points to comments the prosecutor made in the trial court, purportedly to defense counsel's accusation that the prosecutor " 'set up' " this situation by not disclosing Chatman's prior conviction before he testified at the preliminary hearing and then refusing to grant Chatman immunity later at trial. First, the record reveals that defense counsel did not accuse the prosecution in this case of setting up anything, but did use the term "set up" in posing a hypothetical situation and arguing a policy reason for

28

not admitting the prior preliminary hearing testimony.[11]  Second, the prosecutor's response was not in reply to these comments by defense counsel; the prosecutor's comments were made some five transcript pages before defense counsel's remarks.  The prosecutor's remarks appear to be in response to the written opposition to the prosecution's section 1291 motion in which the defense merely asserted, "Insofar as the DA's choice to not grant immunity is premised on good faith, good faith must exclude 'tactical advantage' in litigation (e.g., to shield the witness from cross-examination on topics not explored or known at the time of the preliminary hearing)."  Expressly responding to defense counsel's points and authorities, the prosecutor pointed out that the defense had not cited any legal authorities and that no case supported the argument that a prosecutor's choice not to grant immunity is a reason why a witness is unavailable.  The prosecutor stated:  "That's inaccurate.  That's just not what the cases have held.  DAs are not required to offer immunity. . . .  [¶]  And this idea that it can't be about a tactical advantage.  I'm not sure that this is about a tactical advantage for me.  It's, ultimately, about I don't feel the need to grant immunity to a witness that I don't believe needs immunity.  [¶]  So that's the largest portion of why I've chosen not to grant this witness immunity because, ultimately, I think it should be reserved for situations where immunity is truly necessary.  And there's no case law for that notion whatsoever.  *And I don't believe it's clear tactical advantage by any means for me to not have a live victim testify in a case with three victims.*"  (Italics added.)

Defendant argues that the prosecutor's intent to distort the fact finding process is evidenced by:  the prosecutor's failure to unequivocally deny attempting to gain a tactical

---

[11]  Defense counsel argued:  "[T]hink about how this works in practice.  In practice, we can set up a situation in which the DA calls the witnesses live, doesn't hand over the rap sheet.  Right?  The victim invokes, or the problematic victim invokes in the jury trial.  The DA says I ain't giving that guy immunity, and there we go.  That's where we're at.  That's not such a good situation to be in."

advantage; offering as the only reason he was not providing Chatman immunity, his belief he was not legally required to do so; the prosecution in fact gained "a clear tactical advantage" by not immunizing Chatman; and as a consequence was able to obtain a guilty verdict in a "very weak case." We disagree. First, as can be seen by the italicized text, the prosecutor actually stated he did not believe he gained a tactical advantage by not presenting live testimony from Chatman. Second, the defense did not object at trial on prosecutorial misconduct grounds or assert that the prosecution was distorting the factfinding process or cite decisional authority describing this form of prosecutorial misconduct, so the prosecutor was not on notice of the need to rebut such a charge.

The court in *Quinn* noted that the prosecutorial misconduct theory the Third Circuit had recognized prior to *Smith* provided that the prosecution "violates a defendant's due process right to a fair trial if it acts with the *deliberate* intention of distorting the factfinding process, such as by interfering with a defense witness through threats and intimidation." (*Quinn, supra*, 728 F.3d at p. 257, italics added; see also *In re Martin* (1987) 44 Cal.3d 1, 30 [prosecutor violates due process by engaging in acts of intimidation towards defense witnesses].) But the *Quinn* court adopted the *Smith* factors to claims of prosecutorial misconduct related to the refusal to grant immunity for the reason that proving misconduct under the traditional distortion of factfinding theory was difficult to apply in the immunity refusal context. (*Quinn*, at pp. 257, 258.) Instead, the court held, "If the defendant can show, as a *prima facie* matter, a witness's testimony is available, *clearly exculpatory*, and *essential*—in effect showing that the prosecutor's actions have impaired the ability to present an effective defense—we will consider the due process concerns raised regarding the Government's discretion to grant or deny immunity." (*Id.* at p. 259, second & third italics added.)

Defendant failed to a make any showing that Chatman's trial testimony was both clearly exculpatory and essential. Thus, we need not address whether the prosecutor's comments in the trial court, made without notice of the prosecutorial misconduct claim

30

defendant now makes on appeal, were adequate to show the fifth *Smith*/*Quinn* factor—strong governmental interests which countervail against a grant of immunity. Indeed, because defendant never squarely made a prosecutorial misconduct claim in the trial court and because there was no showing that Chatman's trial testimony would have been "clearly exculpatory" and "essential," the prosecution here was not obligated to articulate a countervailing governmental interest for refusing to grant Chatman immunity. (See *Quinn, supra*, 728 F.3d at p. 263 [circuit court declined to consider whether there was a strong countervailing interest because defendant failed to show the witness's testimony was "clearly exculpatory"].) As we have discussed *ante*, what the defense hoped to gain by cross-examining Chatman at trial was at best speculative and not clearly exculpatory nor essential. Thus, similar to *Quinn*, defendant has failed to establish that the refusal to grant immunity was a distortion of the factfinding process amounting to a due process violation.

### c. Conclusion—Unavailability and Immunity

Because defendant has failed to establish that a grant of immunity was required, we conclude that Chatman was unavailable for purposes of both section 1291 and defendant's confrontation clause rights because Chatman was entitled to and did invoke his constitutional right against self-incrimination.

### 3. Interest and Motive for Cross-Examination

Defendant complains that his motive for cross-examining and opportunity to do so were not the same at trial as at the preliminary hearing because he did not know about and thereby lacked the opportunity to cross-examine Chatman at the preliminary hearing about his prior conviction and the incident involving Mrs. Hull.

Section 1291, subdivision (a)(2), does not require that the cross-examination at the prior proceeding be *identical* to the later proceeding. (*People v. Alcala* (1992) 4 Cal.4th 742, 784 (*Alcala*) [prior testimony from first trial admitted in evidence in a second trial].) Rather, the interest and motive for cross-examination at the prior proceeding need only be

31

*similar* to the interest and motive at the later proceeding. (*Ibid.*) And our high court has made clear, " 'a defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of . . . section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars.' " (*Valencia, supra*, 43 Cal.4th at pp. 293-294.) In other words, the interest and motive for cross-examination does not necessarily change just because the defense develops information after the preliminary hearing about which it did not have the opportunity to cross-examine the witness.

Valencia is an example of this principle and is illustrative on the issue of similar motive for cross-examination. In that case, the trial court admitted the preliminary hearing testimony of a prior robbery victim during the penalty phase of a later death penalty prosecution. (*Valencia, supra*, 43 Cal.4th at p. 291.) After the preliminary hearing, the defense uncovered evidence impeaching the testimony of the victim. (*Id.* at p. 293.) Essentially, the defense found out that the victim had been at the place where he was alleged to have been robbed to engage in sex with a prostitute. (*Ibid.*) The trial court ruled that the defendant had had an adequate opportunity to confront the victim at the preliminary hearing. (*Ibid.*) It also allowed the defendant to present the impeaching evidence during the penalty phase. (*Ibid.*) On appeal, the defendant argued that his cross-examination of the victim at the preliminary hearing would have been different had the impeaching information been known. (*Ibid.*) Our high court held, "[t]his circumstance does not render the prior testimony inadmissible," citing the aforementioned principle regarding changed circumstances and emphasizing that the " ' " 'motives need not be identical, only "similar." ' " ' " (*Id.* at pp. 293-294.) The court reasoned, consistent with the trial prosecutor's closing argument, "the subsequently discovered impeaching evidence that the defense presented at this trial may have shown that [the victim] went to the house to obtain the services of a prostitute, and that he

32

changed some of the details of the actual events to hide this fact, but none of the impeaching evidence directly challenged the basic core of [the victim]'s testimony—that defendant and [a second person] robbed him at that house. *This was the testimony that mattered.* The trial court properly admitted the preliminary hearing testimony and the rest of the prosecution's evidence, and permitted defendant to present his impeaching evidence, and then let the jury decide whether the prosecution had proven this crime beyond a reasonable doubt so that it could consider it in aggravation." (*Id*. at pp. 294-295, italics added.)

Here, defendant's motive in cross-examining Chatman at the preliminary hearing was sufficiently similar to his objective in cross-examining Chatman at the trial. Namely, defendant sought to discredit Chatman's testimony about the vehicular assault and show that he was not the aggressor in the altercation, but rather that he was simply a frightened family man trying to get away from younger aggressors who were throwing rocks at him. Moreover, similar to *Valencia*, the testimony that mattered here was not so much the collateral impeachment evidence, but Chatman's description of the events underlying the charges. (See *Valencia, supra*, 43 Cal.4th at pp. 294-295.)

### 4. Opportunity to Cross-Examine

As for the opportunity to cross-examine Chatman, we first address the incident involving Mrs. Hull. Our high court has stated that " 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether *subsequent circumstances* bring into question the accuracy or the completeness of the earlier testimony.' " (*Wilson, supra*, 36 Cal.4th at p. 343, italics added, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 851-852 (*Samayoa*).) This changed circumstance principle is similar to that referenced by the *Valencia* court in discussing similar motive. Preliminary hearing testimony may be introduced at trial over a section 1291 and confrontation clause objection even when the defense develops

33

information or discovers evidence after the preliminary hearing about which it did not have the opportunity to cross-examine the witness.

*People v. Harris* (2005) 37 Cal.4th 310 is illustrative and analogous here on the issue of opportunity for cross-examination as well as similar motive. There, the trial court admitted the preliminary hearing testimony of an attempted murder victim who was later killed in an unrelated shooting. (*Harris*, at p. 323.) During the preliminary hearing, the victim testified that he earned a living by restoring and selling cars that he had purchased at auctions. (*Ibid*.) He said he and the defendant had engaged in several business dealings and met with the defendant on the day of the shooting so the defendant could repay a debt he owed. (*Ibid*.) The victim was actually a drug dealer. (*Id*. at p. 325.) The defense was that, while the defendant was present, the victim was shot by other drug dealers in a drug transaction gone bad. (*Ibid*.)

At trial, the defendant in *Harris* argued that at the time of the preliminary hearing, counsel did not know of the victim's illegal drug activities and consequently did not have an opportunity to cross-examine with the same interest and motive as he had at trial. (*Harris, supra*, 37 Cal.4th at p. 333.) According to the defendant, the preliminary hearing testimony gave the jury a false and misleading impression of the victim's credibility. (*Ibid*.) The *Harris* court rejected this argument, reasoning that the "[d]efendant cannot now be heard to complain that the defense did not know of [the victim]'s drug dealing prior to the preliminary hearing; by his own admission at trial, he and [the victim] had been engaged in drug dealing for some time" before the attempted murder. (*Ibid*.) The *Harris* court then reasoned that the "[d]efendant's interest and motive in cross-examining [the victim] at the preliminary hearing were similar to those at trial: to challenge [the victim]'s credibility and discredit his account of the shooting. Defense counsel conducted an in-depth cross-examination twice as long as the direct examination, which succeeded in eliciting evidence that challenged [the victim]'s

34

credibility. Accordingly, defendant's opportunity to cross-examine [the victim] at the preliminary hearing satisfied the confrontation clause." (*Ibid*., fn. omitted.)

Similarly, admitting Chatman's preliminary hearing testimony in spite of defendant's professed inability to cross examine him about the incident involving Mrs. Hull did not result in a confrontation clause violation. First, defense counsel at the preliminary hearing engaged in an in-depth cross-examination, asking Chatman questions about the words that had been exchanged, his group's conduct and what was taking place at various points in the surveillance video recording. (See *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1549 (*Hollinquest*) [prior testimony of witness who testified at the preliminary hearing under a grant of use immunity but was later charged in the crime and invoked his right against self-incrimination was admissible at trial; appellate court observed that "defense counsel undertook a thorough and effective cross-examination of the witness" at the preliminary hearing].)

Second, there is nothing in the record here that calls into question the trial court's finding that the defense had access to Mrs. Hull and had over a month to obtain information from her about what happened at the family home the day after defendant's arrest. Defendant argues on appeal that the trial court merely speculated about the defense having access to Mrs. Hull and asked no questions of defense counsel or Mrs. Hull about when she told anyone about the incident. However, the trial court did ask trial counsel questions about when he and his office learned of the incident involving Mrs. Hull. Defense counsel did not say anything to refute the trial court's finding of access to Mrs. Hull or that the defense could have begun its investigation well before the preliminary hearing.

Moreover, Mrs. Hull was no stranger to defendant; they had been together 23 years. Defendant clearly had access to her. Trial counsel told the court that she and defendant resided at the same home, it was only by happenstance that defendant was not home at the time of the incident and the family moved from the home as a result of the

incident. Under these circumstances, the court could reasonably conclude the defense had access to Mrs. Hull.

Furthermore, in light of the fact defendant was residing at the family home the day the incident took place and they moved as a result of the event, it is reasonable to infer that defendant knew of the event even if defense counsel was not actually aware of it at the preliminary hearing. Moreover, the evidence suggests the defense team did know as early as the preliminary hearing about the incident. Contrary to trial counsel's representation, Mrs. Hull testified during the trial that she talked with defendant's first attorney at the preliminary hearing and identified Chatman as the second male. An investigator did not interview her until 28 days later.

Similar to the defendant in *Harris*, defendant here cannot now be heard to complain that the defense did not know of this impeaching information. The defense cannot sit on information—whether because it was not communicated to the defense team by the defendant or not investigated by the defense team—and then later complain it did not have a meaningful opportunity to cross-examine a witness about that information. Like the defendant in *Harris*, who knew all along about the victim's drug dealing activities (*Harris, supra*, 37 Cal.4th at p. 333), defendant here knew about potentially impeachable information well before the preliminary hearing. He thus had the requisite opportunity to cross-examine on this matter.

Third, even assuming Mrs. Hull did not identify Chatman until a year and half later, at the beginning of the trial proceedings, that subsequent circumstance did not mean defendant had not had all of the opportunity to cross-examine Chatman at the preliminary hearing to which he was constitutionally entitled. Preliminary hearing testimony may be introduced at trial over and objection grounded on a claim of lack of opportunity to cross-examine even when the defense develops or discovers evidence after the preliminary hearing about which it did not have the opportunity to cross-examine the witness. (See *Wilson, supra*, 36 Cal.4th at p. 343; *Harris, supra*, 37 Cal.4th at p. 333; *Samayoa, supra*,

36

15 Cal.4th at pp. 851-852; *Alcala, supra*, 4 Cal.4th at p. 784.) Under the circumstances presented here, defendant simply was not constitutionally entitled to an opportunity to cross examine Chatman at trial about the incident at the Hull home.

Defendant again complains that because he did not confront Chatman about the incident involving Mrs. Hull, the jury did not see how Chatman would have responded or consider his demeanor, and as a result his confrontation clause right was violated. Aside from the speculative value of such evidence, we note the constitutional balance that allows prior testimony over demeanor-based objections. In *Hollinquest*, the court wrote: "The preference for face-to-face cross-examination at trial has been found to be outweighed by recognized competing interests that warrant dispensing with the right of confrontation under circumstances where the defense had the opportunity to cross-examine the witness at the previous hearing with an interest and motive similar to that which he has at the subsequent hearing. [Citations.] '[I]t is settled that the preference for live testimony gives way when the witness properly invokes the privilege against self-incrimination and a prior appropriate opportunity for cross-examination existed.' " (*Hollinquest, supra*, 190 Cal.App.4th at pp. 1550-1551.)

The prosecution's late disclosure of Chatman's misdemeanor conviction presents a different problem. The People rely on the fact that the prosecution abided by its *statutory* obligation to disclose prior convictions 30 days before trial. (See Pen. Code, § 1054.7.) However, "a defendant has a due process right under the California Constitution and the United States Constitution to disclosure prior to the preliminary hearing of evidence that is both favorable and material, in that its disclosure creates a reasonable probability of a different outcome at the preliminary hearing. This right is independent of . . . the criminal discovery statutes." (*Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074, 1081 (*Bridgeforth*).) This obligation of disclosure includes impeachment evidence regarding prosecution witnesses. (*Id.* at p. 1083, citing *United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 490].)

37

The trial prosecutor argued in the trial court that the late disclosure did not violate defendant's constitutional rights because the outcome of the preliminary hearing was not affected. However, whatever the prosecution's statutory and constitutional discovery obligations may have been and whether the magistrate would have found probable cause if the conviction had been disclosed is beside the point here. The late disclosure of Chatman's prior conviction deprived defendant of any opportunity to cross-examine Chatman about it. In some other case involving some other type of exculpatory evidence, this error might be critical. The opportunity to cross-examine required by the confrontation clause and section 1291 requires the opportunity for "effective" cross-examination during the prior testimony. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1265; *Wilson, supra*, 36 Cal.4th at p. 346; *Hollinquest, supra*, 190 Cal.App.4th at pp. 1549-1550.) However, while defendants are guaranteed the "opportunity for *effective cross-examination*," they are not guaranteed "a cross-examination that is as effective as a defendant might prefer." (*People v. Carter* (2005) 36 Cal.4th 1114, 1172, italics added, citing *Owens, supra*, 484 U.S. at p. 559.) "[I]n an extraordinary case, it might be ' "necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant." ' " (*Valencia, supra*, 43 Cal.4th at p. 294.) We need not decide whether defendant here was deprived of an opportunity at effective cross-examination as a result of the prosecution's failure to disclose his prior conviction before the preliminary hearing because, as we discuss *post*, any error related to admitting Chatman's preliminary hearing testimony without an opportunity to cross-examine him about his prior conviction was harmless beyond a reasonable doubt.

**5. Harmless Error**

Even assuming the admission of Chatman's preliminary hearing testimony was erroneous, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*).) Since *Chapman*, our

high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*).) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), citing *People v. Aranda* (2012) 55 Cal.4th 342, 367.)

In support of his prejudice contention, defendant argues: the prosecution proceeded to a verdict in a case where none of the alleged victims testified at trial; Hicks and Ramon were the only other witnesses to the events of the incident and neither actually saw Bonner hit by defendant's vehicle; and Hicks could not recall any of the events at trial.

Defendant further asserts that the alleged weakness of the case supports a finding of prejudice. He notes that he was charged with three assaults, but the jury deadlocked on two of the three counts and the last vote on both deadlocked counts was eight votes for not guilty and only four for guilty. Defendant further points to the nine hours of jury deliberations and the fact that the jury requested a rereading of Chatman's testimony during deliberations. And again, defendant argues that the jury was deprived of the opportunity of seeing Chatman's demeanor when confronted with impeachment evidence. Defendant asserts that Chatman's demeanor was crucial to the jury's assessment of his credibility.

In regard to Chatman's demeanor, *Coy v. Iowa* (1988) 487 U.S. 1012 [101 L.Ed.2d 857] is informative. There, the court held that when assessing *Chapman*

prejudice regarding confrontation clause violations, "[a]n assessment of harmlessness cannot include consideration of whether the witness's testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve *pure speculation*, and harmlessness must therefore be determined on the basis of remaining evidence." (*Coy*, at pp. 1021-1022, italics added.) Defendant's argument concerning Chatman's potential demeanor at trial is thus unavailing because, as we have noted, whether his demeanor would have been helpful for the defense is purely speculative. Instead we must examine the remaining evidence.

Regarding defendant's contention that the fact the jury was unable to agree on the counts involving Chatman and Jackson as victims shows the case was against him was weak, we disagree. The jury could have simply disagreed about whether defendant drove the car close enough to Chatman and Jackson to constitute an assault. This could explain their request for re-read of Chatman's preliminary hearing testimony. Or some jurors could have found reasonable doubt based on defendant's testimony that he lost control of his vehicle at the point the assaults alleged as to Chatman and Jackson took place. In any event, we conclude the fact that the jury hung on these counts has no bearing on the strength of the evidence concerning the count alleging Bonner as the victim, particularly in light of the other evidence.

We have already summarized the overwhelming evidence establishing defendant's guilt in our discussion of defendant's immunity argument. However, because defendant emphasizes that Chatman was the only witness who saw defendant's vehicle strike Bonner, it bears noting again that to prove the crime of assault with a deadly weapon in a case where a vehicle is the alleged deadly weapon, actual contact need not be established. The prosecution need only prove that the vehicle was used in a manner *likely* to produce great bodily injury. (*Perez, supra*, 208 Cal.App.5th at pp. 824-825.) The prosecutor pointed this out in his closing argument. Thus, the criticality of Chatman actually seeing defendant hit Bonner is overblown by defendant.

Regarding the incident at the Hulls' home, Mrs. Hull testified that when Chatman came to her home, he was in a passive role, stood by, and appeared to agree with Bonner's assertion that they had been at the home the previous night and that Chatman did nothing to disassociate himself from Bonner's comments. Aside from Mrs. Hull's self-contradiction in previously having identified Jackson instead of Chatman as the second man, her testimony was uncontradicted. The trial court instructed the jury that Mrs. Hull's testimony was admitted to evaluate the credibility of Chatman's former testimony. Therefore, assuming the jury concluded Chatman was the second male, the jury was able to take his participation in the incident into consideration when evaluating his credibility, reducing any prejudicial effect of his lack of opportunity to cross-examine Chatman about the incident.

As for defendant's inability to cross-examine Chatman about his prior conviction, we first note that the only conviction admissible for impeachment purposes was a misdemeanor offense that took place some nine years before the trial. And the jury learned about that conviction through the stipulation. The trial court instructed the jury: "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (CALCRIM No. 316, as given to the jury in this case.) The stipulation and jury instruction allowed the jury to take Chatman's prior conviction into consideration on the issue of his credibility as a witness. Again, defendant focuses primarily on the demeanor the jury did not see. However, if the prosecution had timely disclosed Chatman's prior conviction and defendant had cross-examined him about it at the preliminary hearing, any outward reaction Chatman may have had in response to questions about the conviction would have been reflected in his demeanor at the time, but would not have been seen by defendant's jury later at trial. As

41

for defendant's argument that Chatman may have lied when asked about the prior conviction, whether he would have provided untruthful testimony is just as speculative as the notion that his demeanor would have made him seem less credible in front of the jury.

It is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the asserted errors. (*Geier, supra*, 41 Cal.4th at p. 608; *Livingston, supra*, 53 Cal.4th at p. 1159.) There is no reasonable possibility that the asserted errors contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671.) Accordingly, we conclude that any error in not affording defendant the opportunity to cross-examine Chatman on the matters defendant has identified was harmless under *Chapman*.

## II. The Presentation of Chatman's Preliminary Hearing Testimony

### A. Additional Background and Defendant's Contentions

An employee of the district attorney's office read Chatman's preliminary hearing answers, the trial prosecutor read the questions posed by the prosecutor at the preliminary hearing, defendant's trial counsel read the questions defense counsel had posed, and the trial court read things said by the magistrate. The person who read Chatman's testimony was the prosecutor who handled the case during the preliminary hearing.

Defendant asserts that it was incumbent upon the prosecution to provide a videotape of Chatman's preliminary hearing testimony to show the jury at trial and thus provide some protection to his right to confrontation. Defendant contends that " '[t]his would have facilitated a chief objective of the confrontation clause, which is to allow the jury an opportunity to observe the witnesses' demeanor while testifying under oath.' " He further contends that the procedure employed for reading the testimony here was an "elaborate re-enactment" with individuals playing roles from the preliminary hearing and suggests that this procedure substituted the demeanor of the person who read Chatman's

testimony for Chatman's own demeanor. We reject these completely meritless contentions.

### B. Analysis

#### 1. Videotaping

Defendant relies primarily on two cases in making his argument about videotaping Chatman's preliminary hearing testimony, *People v Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*) and *Hochheiser v. Superior Court* (1984) 161 Cal.App.3d 777 (*Hochheiser*), abrogated by Penal Code section 1347. Neither of these cases supports defendant's contentions.

In his reliance on *Roldan*, defendant points to the *Roldan* court's statement, "Since the prosecution knew the federal government intended to deport [the witness] following the preliminary hearing, videotaping his testimony would have allowed the jury ' " 'to look at him, and judge by his demeanor upon the stand and the manner in which he [gave] his testimony whether he [was] worthy of belief.' " ' " (*Roldan, supra*, 205 Cal.App.4th at p. 981.) Attempting to make his situation analogous to *Roldan*, defendant argues that because the prosecutor knew Chatman could have faced charges for several potential crimes and would likely be represented by counsel, the prosecutor should have expected him to invoke his Fifth Amendment right at trial. This, according to defendant, means that the prosecutor was obligated to videotape Chatman's preliminary hearing testimony, as in *Roldan*.

However, the instant case is clearly distinguishable from *Roldan*. In *Roldan*, the prosecutor knew that the federal government intended to deport the witness who testified at the preliminary hearing. (*Roldan, supra*, 205 Cal.App.4th at p. 981.) Here, the prosecutor did not know that Chatman was going to invoke his Fifth Amendment right against self-incrimination. Indeed, defendant never explains how the prosecution would have even known about the incident involving defendant's wife at the time of the preliminary hearing when a statement was not even prepared until 28 days after the

preliminary hearing and the prosecutor was not given a copy of it until the beginning of the trial proceedings. Based on the record before us, Chatman willingly testified at the preliminary hearing and only later invoked his Fifth Amendment right after the incident involving Mrs. Hull was made known and the court appointed counsel to represent him. To require the prosecutor to provide a videotape of Chatman's preliminary hearing testimony would effectively place the same requirement on prosecutors in *any* case in which a witness *may* subsequently invoke their Fifth Amendment right in the future for an unanticipated reason. We do not "demand that prosecutors become clairvoyants." (*People v. Shane* (2004) 115 Cal.App.4th 196, 205.) Nor do we require magistrates to agree to videotaping of preliminary hearing testimony under such circumstances.

Defendant's reliance on *Hochheiser* is likewise misplaced. The *Hochheiser* court granted a writ of prohibition to restrain the superior court from taking child victims' trial testimony by closed-circuit television from outside the courtroom, noting serious questions about the effects such a presentation would have on the jury. One concern was the impression jurors would have about the witness's demeanor under such circumstances. (*Hochheiser, supra*, 161 Cal.App.3d at pp. 786-787.) The *Hochheiser* court held that the trial court did not have the authority to implement such far-reaching procedures of presenting testimony in a criminal trial in place of the traditional methods of presenting testimony without statutory authorization, even in light of concerns for the psychological well being of the minor victims. (*Id*. at pp. 783-792.) Not only are the facts and procedural posture here distinguishable, this holding has since been abrogated by Penal Code section 1347. (*People v. Lujan* (2012) 211 Cal.App.4th 1499, 1508.) Accordingly, it does not help defendant here. The prosecution was not required to videotape Chatman's preliminary hearing testimony.

In his reply brief, defendant shifts gears and argues, "[t]he point is not that the prosecutor erred by failing to videotape Chatman's preliminary hearing testimony but that failure to do so is additional evidence of the prosecutor's intent to obtain an

advantage at trial by withholding Chatman's demeanor from the jury." New arguments may not be raised for the first time in an appellant's reply brief. As noted in *People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, footnote 2, " '[o]bvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief. To withhold a point until the closing brief would deprive the [People] of [the] opportunity to answer it or require the effort and delay of an additional brief by permission. Hence, the rule is that *points raised in the reply brief for the first time will not be considered,* unless good reason is shown for failure to present them before.' " This court has repeatedly recognized this well-settled principle of appellate practice. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52; *People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5.) And we follow it here. In any event, defendant fails to explain how the prosecutor could have somehow decided not to videotape Chatman for a tactical reason when the prosecutor did not know about the incident involving Mrs. Hull at the time of the preliminary hearing and had no information that would lead him to believe Chatman would invoke his right to remain silent a year and a half later.

## 2. Reading of the Preliminary Hearing Transcript

Defendant asserts that reading the testimony was somehow improper, asserting that the testimony "was essentially re-enacted and role-played, thus imparting to Chatman a demeanor that was certainly not his." This "role-playing," defendant asserts, "impart[ed] a sense of reality and immediacy to what were no more than words on a transcript, and hence, likely enhanced a sense of credibility that was not warranted." First, defendant did not object to the manner in which the transcript was read to the jury. "Absent such objection, it must be presumed that defense counsel was satisfied." (*People v. Gentry* (1969) 270 Cal.App.2d 462, 469, fn. 12.) Thus, the contention is forfeited. Second, what was done here, in our experience, was a common practice and defendant has not cited any authority disapproving of this method of reading prior testimony to juries. Indeed, there are examples in the case law where similar methods were used

45

without any suggestion that the reading was improper. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1065 [prior preliminary hearing testimony of a robbery victim was read to the jury by secretary from prosecutor's office]; *People v. Malone* (2003) 112 Cal.App.4th 1241, 1244 [prosecution read a defendant's prior trial testimony]; *People v. York* (1966) 242 Cal.App.2d 560, 563 [court permitted the prosecutor to read a witness's prior preliminary hearing testimony].) Third, there is nothing in the record establishing defendant's speculative argument that "the credibility of Chatman's testimony was enhanced by this means." The jury obviously knew the reader was not Chatman, and we simply do not see how a reasonable jury would have imputed the reader's demeanor to Chatman.

### III. Ineffective Assistance of Counsel
### A. Background and Defendant's Contentions

The trial court initially reasoned that defense counsel was made aware of the incident involving Mrs. Hull on October 29, 2013, but the court later realized that the incident occurred on August 26, 2013. The court then ruled the defense could have examined Chatman about this information had they done their investigation sooner, and allowed the admission of Chatman's preliminary testimony under section 1291.

Defendant contends that in the event we agree with the trial court's ruling that defendant had access to Mrs. Hull prior to the preliminary hearing and thus had a meaningful opportunity to cross-examine Chatman, then counsel was ineffective for not cross-examining Chatman regarding his role in the incident. We disagree.

### B. Analysis

To prevail on a claim of ineffective assistance of counsel, a defendant must show that the (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694];

*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].) The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "The *likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.) *Strickland*'s prejudice standard applies even when a defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008-1009.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one,

47

or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) For this reason, "[a] claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

As we have noted, Mrs. Hull testified that on the day of the preliminary hearing, October 1, 2013, she told defendant's first attorney that Chatman was the second male who had came to the family home. However, trial counsel represented to the court that his office was not made aware of the incident until October 29, 2013, and when a report was written concerning the interview of Mrs. Hull on that same day, she identified Jackson as the second person. Counsel who represented defendant at the preliminary hearing has provided no input on these matters, and counsel may have had a tactical reason not to confront Chatman about the incident at the preliminary hearing. Based on the record before us, defendant has not established that defense counsel's performance fell below an objective standard of reasonableness.

Nor has defendant established prejudice. Mrs. Hull's testimony about the incident was considered by the jury on the issue of Chatman's credibility, without any contradiction by Chatman at trial. Moreover, as we have discussed *ante*, the cumulative evidence aside from Chatman's testimony overwhelmingly establishes defendant's guilt. Defendant has failed to establish the required prejudice to support his claim of ineffective assistance of counsel.

Accordingly, defendant's claim for ineffective assistance of counsel fails.

## DISPOSITION

The judgment is affirmed.

                                        s/MURRAY      , J.

We concur:

      s/HULL         , Acting P. J.

      s/ROBIE        , J.